v. Howard W. Lutnick, in his official capacity as Secretary of Commerce and National Marine Fisheries Service, Mr. Atkinson, for the at-balance, Mr. Peterson, for the at-release. Good morning, counsel. Mr. Atkinson, please proceed when you're ready. Thank you. Good morning. May it please the Court, my name is Seth Atkinson, and I'm here on behalf of the plaintiffs' appellants in this matter. So today, I'd like to walk the Court through the A.P. Bell case and explain why that case deals with a different question of law than this matter does at hand. In our briefing, we set forth several options for how this Court could deal with the A.P. Bell case, but we believe the best of those options is distinguishing it on the law. Because essentially, it ends up making far better sense of the case than any of those other approaches, and I'll get into why. I should note at the outset, I'm not planning on addressing timeliness or mootness. I think those are adequately covered in the briefing, but I'm happy to answer any questions you may have on those. So let's turn to the A.P. Bell opinion. If you have it handy, it's in the blue brief, page 45. It's not a problem if you don't. I'll help walk you through it. And if you have the reporter copy, it's on page 65. So the main thing to notice here is this is a challenge to an overfishing limit. You see that in the first paragraph, the fourth and fifth sentences there, where the Court sets forth Final Amendment 53 set the overfishing limit in terms of landings, not catch. Appellants contend that this fails to establish catch limits or ensure accountability with them. So as a refresher, an overfishing limit is one of several upstream numbers that can be used in the course of setting an annual catch limit. It's essentially a stopping off point on the numerical chain from the stock assessment and projections over to the final annual catch limit that is ultimately set. It also has another use under a different part of the statute, but that's not an issue in this case. From the perspective of 16 U.S.C. section 1853A.15, the annual catch limit requirement, the main relevance of the overfishing limit is that it can contribute to the reasoning or basis of the annual catch limit that's ultimately set. So to be clear, the overfishing limit is not a statutorily required part of the annual catch limit mechanism. It's something the agency created through its regulatory guidelines, which do not have the force of law. It's kind of regulatory infill, if you will, a suggested step to help justify the eventual annual catch limit. So the Court in AP Bell is explicitly resolving an argument about an overfishing limit. In those fourth and fifth sentences, you see that the plaintiffs were arguing that by setting the overfishing limit in landings-only units, the agency had violated the statutory requirement for annual catch limits and accountability measures, so section 1853A.15. But here's the thing. There's nothing in the statute that requires an overfishing limit to be used, and in some situations, it's not used at all. The annual catch limit is set a different way entirely, and that's fine from the perspective of the statute, so long as the catch limit ends up having a reasonable basis and is not arbitrary and capricious and so forth. So as a logical matter, if the statute doesn't require use of an overfishing limit at all, then it definitely doesn't require an overfishing limit to be set in one particular unit or another. And that's exactly where the AP Bell Court goes in the following paragraph. You can see there's a few factual statements to start with, and then the fourth sentence there is really the key one. It says section 1853A.15 requires only the establishment of annual catch limits and accountability measures such that overfishing does not occur. And then it goes on to say it does not require the further step of setting an overfishing limit that more directly accounts for bycatch. So let's break that down. The first part of that sentence is essentially a reminder to the reader that the statutory requirement here is for annual catch limits and overfishing, not for overfishing, excuse me, annual catch limits and accountability measures to prevent overfishing. That's what the statute actually requires. And the second part of that sentence is the holding and the observation that the statute actually doesn't require anything in particular of an overfishing limit. So it's the first part there is setting forth this is what the statute actually does require. And the second part of that sentence is saying with respect to an overfishing limit, it doesn't require anything at all. So this case is one in which the panel resolved a challenge to an overfishing limit. And its holding is that under section 1853A.15, the agency is not required to do particularly anything vis-à-vis the overfishing limit if it is used at all. And that's sensible enough. We believe that's the best reading of AP Bell because that's what the text of the opinion actually says when you look closely. And as a consequence, it's completely distinguishable from the case at hand. We're challenging the annual catch limit itself for failure to comply with the statutory requirement for an annual catch limit mechanism. There's a one-to-one correspondence between the subject of challenge in this case and the statutory requirement. Essentially, you can think of it as the plaintiffs in AP Bell shot at the wrong target, whereas here we're on target. So do you think your theory just has no implications for the challenge in AP Bell? That's right, Your Honor. In other words, if your theory is right, you think that just doesn't have anything to do with the results in AP Bell? Thank you. I think the result in AP Bell is a very minor and peripheral holding relative to the annual catch limit mechanism requirement in the statute. It's fairly ancillary and will affect very little going forward. It simply instructs the agency that it doesn't have to do anything in particular regarding overfishing limits. I think our case deals with a very central concept of what the agency has to do under the annual catch limit mechanism, like what the annual catch limit mechanism actually has to look like. So that's a very big question on the merits, whereas the AP Bell case was dealing with a small and fairly unimportant. But could the agency continue to do what it did in AP Bell vis-a-vis what you say is a distinct issue that was presented there, even if your theory on the merits prevails? I see what you're saying, sir. If a plaintiff challenged the eventual annual – so I'm going to assume we don't have it before us, but the annual catch limit, the eventual annual catch limit in AP Bell was set in landings-only units. Let's assume that. If a plaintiff – and I'm also going to assume there is a non-trivial amount of debt discards in that fishery, so that is an incomplete annual catch limit. If a plaintiff going forward were to challenge that annual catch limit mechanism, it would be spot on with this case on all fours. But it would have to be a target to the annual – a target of challenge that is the annual catch limit mechanism itself, not the overfishing limit, which is a small ancillary part of the whole operation. Am I answering your question? I think so, but then it sort of seems like there is overlap then. If your theory prevails here, I'm not sure how the results in AP Bell could be the same. It can be the same until somebody challenges it. So we – look, we fully believe that what they're doing over there also violates the statute. I just think as a litigation matter, the plaintiffs in that case took aim and shot at the wrong target. They shot at the overfishing limit, which the statute doesn't require anything of. If they had gone after the annual catch limit mechanism itself, then the holding of the court would have to logically be relative to an annual catch limit mechanism vis-a-vis the statutory requirement. That's what we're doing here. They essentially missed in that case. Is that making sense? I think I understand the argument.  So there's a second reason I'll blaze through here why we think this is the best reading of AP Bell, and it's more based on omity or avoidance. The reading I just gave you of that case is one in which the court's resolving a narrow question, precisely the one that was presented to it, nothing more, and it comes out correctly on the merits. There's, in fact, nothing in Section 1853A15 that requires anything in particular of an overfishing limit. There's a broader reading of AP Bell, one in which the court holds that as defendants say in their brief, page 36, the Act only requires the agency to set an annual catch limit that it determines will prevent overfishing. So to paraphrase, if we believe overfishing will not occur, our job is done. That's their takeaway. That's their read of AP Bell. If this were the holding of AP Bell, it would mean, first, that the court went well beyond the actual claimant issue in that case, and that it got the statutory interpretation of Section 1853A15 completely wrong. And we went in, in our briefs, into detail about the text structure and history, so I won't recap that here. I'll just use a simple analogy, but the annual catch limit requirement is like, it's very similar to the requirement of filing a tax return. It's a requirement to use a particular mechanism or structure for the purpose of vindicating a wider substantive mandate. In the case of taxes, it's to ensure taxes owed are paid. In the case of annual catch limits, it's to ensure that overfishing is prevented. And reading this type of requirement as an outcome-based provision turns it completely on its head. It would be like saying, as long as you think you've paid the right amount of taxes, you don't really have to worry about filing a tax return. That's not how it works. Congress made clear that tax returns and annual catch limits are a freestanding requirement, independent from the underlying obligation to pay taxes or avoid overfishing. And more specifically, tax returns and annual catch limits are how the underlying requirement gets fleshed out, defined, and operationalized. They're structures that Congress ordered to be used for that purpose. It would be a bad misreading of 1853A15 to miss this. So if you consider those two possible readings, one is a narrow reading in which the court got it correct on the merits, and the other is a very broad reading where the court got it very wrong on the merits, I'd submit to you that as a matter of hominy and respect to the prior panel and maybe some kind of avoidance principle, this court should adopt the narrow reading in which the court gets it right. I see I'm also out of time. I'm sure my colleagues don't have additional questions for you. I do. So, Mr. Atkinson, taking it from where you've led us, we're back to then to A15, pure and simple. And a plain statement of your claim at that point is I take it that what the agency has done here does not constitute setting an annual catch limit sufficient to prevent overfishing. That's right, Your Honor. The annual catch limit requirement indeed requires a limit on the catch annually. And it says that in the text. It's implied in the structure because it's necessary to limit all the catch. Go ahead. But as the previous court also said, catch itself is not defined in the statute, correct? It's not, Your Honor. It takes its plain meaning here. And in the world of fisheries, catch always means catch. It's landings, dead discards. A dead fish is a dead fish. The agency, in fact, in its own regulatory guidelines, which are not binding, but it says exactly that. Catch is all catch. And everybody knew that at the time, Your Honor. And it has to be all catch because if the goal is, if this mechanism is to operate to prevent overfishing, overfishing can be caused by dead fish writ large. It doesn't have to be landed fish. It doesn't have to be dead discards. Any dead fish, right? All dead fish count towards overfishing. So if this mechanism is to achieve its goal of preventing overfishing, it has to encompass all the catch in the fishery. It's like a budget, Your Honor. Go ahead. I think you said in your brief that if there were a strict relationship between landings and byproduct, right, catch, then there would be no necessity to get into anything other than landings, right? But then you said empirically there is no such strict relationship. But suppose then the agency says, well, the relationship varies. We can see that. You have the data. But it's simply impractical to do more than shoot for something that we hope will work measured in landings, and we can course correct as we go from year to year. Understood, Your Honor. So the question essentially is about what if it's difficult to deal with dead discards? Can we just use landings as a proxy or as the main part of the catch limit and go forward like that? Fair enough. So this statutory requirement was passed into law 20 years ago. At that time, Congress gave the agency between three and four years to implement it. They provided funding for the necessary science, management, technical overhauls that were needed. Everybody knew this was a big deal at the time. It's the single biggest amendment in the Act's 50-year history. And this now has been 20 years since that amendment passed in that fishery, and they're still not doing it. On some level, Your Honor, it's a statute says it, so do it response. It's really not possible. Is it your position that the agency is incorrect in saying that the problem of measuring discards by recreational fishermen is such that there's no way to do it? Your Honor, we have no position on the different data sources relative to recreational dead discards. The statutory requirement is very clear here. The text, structure, history all line up. This is a required mechanism the agency has to use, and it becomes ineffective when any non-trivial amount of catch is excluded from the mechanism. It's like a budget. It's like your household budget. If you have a budget and it only covers cash expenditures, that's not going to be an effective budget if you have any appreciable credit card spending. So this was known at the time Congress provided funding and a long runway for implementation. So it's an unambiguous statutory requirement. I don't remember seeing anything in your account of the evolution of the statute suggesting that Congress understood that the measuring the bycatch was so challenging. No, sir. There's not a specific reference in the legislative history to recreational bycatch. Everybody understood that when you're talking about annual catch limits, you're limiting all the catch in a fishery. So this was a very broad requirement that was going to apply to all federal fisheries around the nation. Fisheries vary radically from region to region, even from fishery to fishery within the same region. So each is going to have its own unique problems. And the issue of implementation, in fact, was discussed heavily at the time, and Congress heard the arguments that this would be difficult. It was going to be hard. It was going to take time. We're not sure if we can do it. And they explicitly rejected that. They said this will be a requirement going forward. Here's the money. Here's the time. Now go do it. So you're right. It doesn't say explicitly in the legislative record about recreational debt discards. But that was part of the general implementation discussion at the time. But if – can I follow up on Judge Ginsburg's questions for a second? So if it were taken as a given that a limitation on landings has the effect of limiting debt discards also, if you take that as a given, then would your challenge still exist, or would you be okay with a limit that's framed just in terms of landing, even though the statute talks about a mechanism for specifying annual cash limits? Understood, sir. So in your household budget, credit card spending can only proceed in lockstep with your cash spending. That's what you're hypothesizing. Is it okay to only limit cash spending in that case? The answer is yes. You have a limit. Okay, but suppose it's not lockstep. I mean, if it's not a direct ratio, there's not some mandate that says debt discards have to be .X of landings or something like that. But there's – but it's also true that limiting landings has the effect of limiting debt discards. It's just that we don't – we can't say, oh, if we limit landings to one, that means debt discards are going to be limited to 1.X. We don't have that direct proportionality or some direct tracking mechanism to know exactly what that means for debt discards. But we also can't – it's very prohibitively difficult to calculate debt discards. And so what we're going to do, the agency would say, is we know that even though we can't calculate debt discards, that limiting landings is going to have an effect on debt disregard – on debt discards. What exactly that effect is going to be, we don't know. We just know that it's going to have an effect on limiting debt discards. So one way we're going to get at cash limit is to limit the one thing that we do know how to measure, which is landings. And we're going to do it that way. And then every year we're going to take stock of where we are as a general matter to try to figure out whether we're getting to an overfishing problem or not. But we're going to do it the one way we can. We're going to limit landings. And that's going to have some effect on debt discards without us being able to say it's going to be the direct effect that results in X number of debt discards. So your answer is no. That would not comply with the statute. It's unambiguous that cash has to be limited. So what would the limit on cash be in that case? Cash would still be limited. It's just that you wouldn't have a number. The cash is going to be limited to whatever the number of cash is if you limit landings to X. There's still a cash limit. It's going to be a cash limit that's a result. It's not a priori setting that the cash limit is going to be 200. It's going to be whatever the cash is if we limit landings to 50. So, Your Honor, that's pre-2006 management. You've just described it exactly. We put in place some measures. We think they're going to roughly limit things, and we see how it works. That's exactly why Congress put in place this statutory amendment. It's because under that system of essentially do your best and see how it came out, do your best to see how it came out, that was the only operationalization of National Standard 1. So under the Act, National Standard 1 has prohibited nominally overfishing from the get-go. For those first 30 years, what you described was exactly the management pattern. The managers would adopt a bundle of management measures, say we think this is going to limit catch enough to avoid overfishing. We'll check in on it next time we know, and we'll adjust it if not, and we'll check in again, we'll adjust it if not. That led to chronic overfishing, and it's documented very well in the legislative history here that that's what Congress was saying no to. You need an actual mechanism. Was there sometime a limitation on landings, an overall limitation on landings that was imposed? In some fisheries, yes. In individual fisheries? Yeah, from place to place. By whom was that imposed? The agency, sir. I might not understand your question. In some cases, absolutely. In other cases, there was no explicit cap, but again, it was we set some measures, see how they worked. The see-how-it-worked-and-try-again approach is precisely what annual catch limits was intended to displace. It's a structure that the agency has to walk through on an annual basis to ensure that it's constraining catch prospectively, proactively. Instead of this in hindsight, how do we do, okay, we'll try again approach. So that's exactly it. And just to your question, Your Honor, I'd push back a little bit on the sort of on the difficulty of doing this. There are ways, there are numbers for recreational dead discards. The agency absolutely has them. There are ongoing new efforts to generate better numbers. What you see in the record here around Amendment 43 in those letters to and from the science director and the regional administrator, I hesitate a little bit to say it, but we're a product of the political moment in 2017 under a new administration that wanted to sort of ease what it saw as regulatory burdens. That was a moment in time. The agency uses, it has numbers on dead discards. It continues to use them in stock assessments and other purposes. So these numbers exist, and there are ongoing efforts right now to improve them. And that's exactly what the statute. Mr. These are initially the numbers exist. These are the numbers that are based on the recollections of recreational fishermen. Is that correct? That's correct, Your Honor. It's a determined that those numbers are unreliable. They exist, but they're not worth anything. That's thank you for the question. That's not actually true. Those numbers are worth something. It's a multi-pronged survey that generates those numbers. There is an interview component. There is a, well, now it's an Internet-based survey component. There's dockside intercepts. So they collect information in multiple ways that get integrated into the results of this multifaceted survey. And I had a second thought, and I just lost it. I'm sorry. Well, maybe you can give it to us in rebuttal if you have it. Yeah. Let me make sure my colleagues don't have additional questions for you at this point. We will give you some time for rebuttal. Okay. Thank you. Okay. We'll let the government now. Mr. Peterson. Good morning, Your Honors. May it please the Court. My name is Ezekiel Peterson here on behalf of the Fisheries Service. I want to start with A.P. Bell and the merits because that's where my friend on the other side started. I do just want to note that, so I think A.P. Bell controls this case. I think that's as far as this Court needs to go. But even beyond that, what plaintiffs are asking this Court to do is to read a requirement into the statute and read text into the statute that simply isn't there. The only requirement in the statute, and this is the reasoning of A.P. Bell. I think plaintiffs have glossed past this a little bit. This is what A.P. Bell says. Section 1853A15's only requirement is to, quote, establish annual catch limits and accountability measures such that overfishing does not occur. That's what A.P. Bell says. And to add an additional requirement that those annual catch limits must also account for debt discards rather than just landings is reading additional text into the statute that's not there. Congress didn't say how the agency has to establish annual catch limits in order to ensure that overfishing does not occur. It just said that it has to do that. It necessarily leaves some discretion for the fishery service to determine how to accomplish that goal. I think here the fishery service certainly explained in the records at page 230 and 232 why it took this specific approach to setting the annual catch limit for the South Atlantic red snapper fishery. Judge Ginsburg alluded to this, but the agency determined that these debt discards estimates at the time were not appropriate for management use. They had very high scientific uncertainty. They were based on fisher recall. And the agency coupled that with a determination, again at JA 230, that red snapper populations and biomass in the South Atlantic was increasing. They were reaching levels not seen since 1970s. Clearly the management was working. Thus, the agency satisfied its requirement to, the only statutory requirement, to set an annual catch limit such that overfishing does not occur. That was a reasonable determination. That was all that was required under the statute. And that's what AP Bell says, too. It says that NIMS is not obligated under the Magnuson-Stevens Act to set an annual catch limit that directly accounts for debt discards. Certainly that challenge was focused on the – Where did you get that, that directly accounts for debt discards? You're not reading from the opinion, right? One moment, Your Honor. So it's a combination of the, I think, third and fourth sentence of that paragraph. Because the annual catch limits are based on the overfishing limits, the annual catch limits account for bycatch in the same fashion. And the statute only requires the establishment of annual catch limits such that overfishing does not occur – does not. So I'll grant you, Your Honor, there's one step of logical inference there. That's not a direct quote from the statute. But the – I think what AP Bell is getting at in this paragraph is that the overfishing limit is an upstream number that's used to calculate the annual catch limits. The only requirement in the statute is that the annual catch limit must be set such that overfishing does not occur. And if the agency sets this upstream limit without including debt discards, that's perfectly acceptable. Plaintiff's reading of AP Bell, I think, would eviscerate that paragraph and that reasoning that AP Bell uses to get to its result. Essentially, if their theory on the merits prevails, it erases that conclusion. And all this court has to do is follow that holding from AP Bell. Unless the panel has questions about that or about the merits, I'm happy to answer those. What's your response to the notion that if the agency is allowed to avoid directly figuring debt discards when it establishes a mechanism for specifying annual catch limits, then that effectively resuscitates the regime before the relevant statutory provisions came into being? I think that's wrong, Your Honor, because I think the agency is doing exactly what the statute commands. It's setting an annual catch limit, a measurable catch limit. And certainly the agency is specifically, as AP Bell explains, is defining catch in a certain way as far as landings and not debt discards. But it's setting an annual catch limit such that overfishing does not occur. And, you know, as I alluded to at JA 230 and at JA 390 in the most recent amendment, I think the situation on the ground bears out that that management approach has worked for the agency. You know, at JA 390 in Amendment 59, the agency determines that the South Atlantic red snapper fishery is no longer overfished. So I don't think it's reverting back to a prior version of the statute because it's complying with all the text of the statute. The statute says set an annual catch limit such that overfishing does not occur. And that's precisely what the agency is doing. Before this amendment, oh, excuse me. No, go ahead. Mr. Peterson, before the amendment, I think we heard from Mr. Atkinson that the agency was setting annual catch limits in some fisheries but not others. Is that your understanding? I believe that's correct, yes. And if so, then how were those limitations expressed? Was it in terms of landings? I am not sure, Your Honor. But I would imagine so. Well, part of his argument is that in the industry at the time, as well understood by the oversight people in Congress, catch meant all catch, not just the catch that ends up in landings. Does that seem like a matter of ordinary language or trade language? No, Your Honor, we don't think so. We think that the agency necessarily has some discretion within the scope of the statute in order to comply with the mandate to set an annual catch limit such that overfishing does not occur. And here the agency explains why it – no, it has these guidelines that are cited in the brief that define catch generally to be including both dead discards and landings. But it gives a reasonable explanation, the agency does, as to why it departed from those guidelines. And that's something that AP Bell discusses as well. It's certainly within the agency's discretion to do so. Well, let me ask you this then. Before the amendments, what were the sort of alternative mechanisms that were used to limit or to try to avoid overfishing? I think the limitation on the recreational season was one. Was it not even before this amendment? I believe that's correct, limitations on the opening closed date of the season. I'm not particularly well versed in the other limitations that were in place. So do you think that the agency would satisfy the statutory mandate to establish a mechanism for specifying annual catch limits, even if the limit that's specified is cabins to landings and a limit on landings has no relationship, no effect whatsoever on the number of dead discards? I think the agency has to make the determination that doing so would be acceptable such that overfishing does not occur, because that's the statute. I understand that. So it's a limit on landings. The agency says we're going to limit landings. That's an annual catch limit. We're sure that, oh, and then we think that's not going to affect overfishing. Yes. We have no idea, actually. Suppose the agency goes further and says catch is generally thought of to include not just the number of landings, but also the number of dead discards. But we're only going to limit landings, and we don't think overfishing is going to occur as a result. We have no idea what the catch is going to be, actually, because we don't know what dead discards are. Yes. So I think that would be facially in compliance with the statute. Facially in compliance with the statute. In compliance with the statute. That kind of reasoning could potentially be open to an APA, you know, arbitrary and capricious challenge that the agency didn't sufficiently flesh out its reasoning that, well, this annual catch limit would actually be such that overfishing would not occur. But plaintiffs are very clear at page 32 of their brief. That's not the kind of challenge that they're bringing here. What they're saying is that the agency can never exclude dead discards from the annual catch limit and still be in compliance with the statute. And that's just reading this requirement into the statute that doesn't exist in the text. Is what I just described, is that a characterization in your view of what the agency, in fact, did? Your Honor, I think the agency here has a more fulsome record of why specifically it does not expect overfishing to occur and why dead discard estimates are inappropriate for management use at JA 230 and 232. So there's more in the record than your explanation. But it certainly complies with the statute. It doesn't run afoul of any statutory requirement. Could the agency, for example, then come up with a scheme that limits the number of hours that vessels can be out in the water and say if we limit the number of hours, we think that's going to limit overfishing. It's going to prevent overfishing. And that's our mechanism for specifying annual catch limits. I think potentially, so long as it offers a reasoned explanation for how over a certain number of hours, vessels are expected to catch a certain number of fish, that is a limit on catch. That certainly functions as a limit on catch. And if the agency provides the necessary explanation in the record as to why that sort of limit on catch would be effective at preventing overfishing, that could comply with the statute. And catch for those purposes wouldn't have to be the overall catch. In other words, it could exclude a significant component of the catch like landings or like dead discards. Your Honor, I'm sorry. Can you rephrase that question? Yeah, I guess what I'm getting at is if you're going to get — if you're using hours as hours that vessels are out in the water, I'm just making up stuff. Sure, sure. I don't think it has anything to do with the statute. It makes no sense to anybody in the industry. But I'm just trying to understand the parameters of your reading.  Because that kind of limit, a limit on hours, by any appearance doesn't look like it's an annual catch limit because it's not limiting catch at all. Right. I mean, it might have the effect of limiting the catch because the fewer hours you're in the water, the smaller the catch is going to be. I think that sort of limit would be very vulnerable to an APA-type claim. I mean, the agency would have to really back up that sort of limit with, you know, this is actually functionally a limit on catch because of X, Y, Z. But that's, I mean, pretty far removed from the situation we're in here. Here there is a limit on the number of landings. That's clearly directly tied to catch, and the agency backs up its explanation. But what you just said is only directly tied to catch. The landings is only directly tied to catch if landings has some relationship to dead discards. Yes. Yes, Your Honor. It is tied to the entire red snapper mortality if there's some relationship to dead discards. That's correct. If you're construing catch to include dead discards, if the general understanding of catch includes dead discards because catch is not just the landings but is also dead discards, then in order to have an annual catch limit that's pegged to landings, there's another segment that's not being accounted for unless landings have something to do, some relationship with that other segment. I think that's generally true. I mean, I think we would push back on whether catch necessarily includes dead discards. Do you think we have to conclude? Put aside AP Bell for a second. Okay. I understand your argument about that, that we shouldn't even be talking about any of this because it's foreclosed by AP Bell. Sure. But let's just get past that for a second. Sure. So if we were to go straight to the merits without regard to precedent, would you say that in order to rule for the agency's interpretation, we'd have to conclude that catch can be limited to just landings without regard to dead discards? I think you would have to conclude that, yes, Your Honor. That's your understanding of what the agency did in your argument, is it? That's our understanding because in Amendment 43, and again, I should just put a pin in the fact that this whole management system has changed now that we have Amendment 59. But in Amendment 43, the agency said that dead discard estimates are unreliable. They're based on very small sample sizes. They're not appropriate for management uses. We've seen this increase in red snapper biomass. It's the highest it's been since the 1970s. So we're going to put aside dead discards for now, set a limit in terms of landings, which is something we can actually on the water effectively manage for, and we will still expect to prevent overfishing. I see my time's up. Unless the panel has any questions about the merits or any threshold issues, ask this court to affirm. Oh, I have one question. I'm sorry. Oh, please. Very quickly on one threshold issue.  So the timing, the timeliness question? Yes. Does the government think that's a jurisdictional limit? No, Your Honor. We think that the court can do what the district court did and assume hypothetical statutory jurisdiction to reach the merits. Oh, but I think that's different. Assuming hypothetical statutory jurisdiction seems different to me. That the timeliness requirement is not a jurisdictional requirement.  We don't think, I think in light of the most recent Supreme Court precedent, there's nothing that would suggest this is a jurisdictional statute of limitations. Yeah. Okay. Well, Mr. Peterson, why would we get into that if the statute on its face makes the filing timely? As the Ninth Circuit and Fourth Circuit decided. So, Your Honor, as to the timeliness issue, it's certainly the case that the statute under the 1990 amendments allows for the challenge of regulations and the challenge of actions taken under regulations. And it's undisputed here that the 2023 and 2024 temporary rules were actions taken under Amendment 43. But that language was added. Okay. Sorry for the interrupt. Judge Ginsburg, you're able to hear? Yes, I am. Thanks. Okay. Sure. Pick up where you are. Perfect. Will do. I'm just going to cut to the chase here on the timeliness issue. I think our position as the government aligns with what the district court said in its opinion at page 24, which is that Congress could have amended the statute to say that regulations were reviewable both 30 days after they were promulgated and 30 days after any sort of subsequent action was taken under them. But it didn't. It broke it up into the regulations after 30 days and actions after 30 days. And here our argument is that where plaintiffs are challenging really, truly, facially the substance of the action that is taken in Amendment 43, they should have brought that challenge within 30 days. We acknowledge that the Ninth Circuit and the Eleventh Circuit have reached somewhat contrary results. We think those cases were largely based on fairness and equitable concerns that aren't present here. But our argument is that this court or this claim should be barred by the 30-day statute of limitations, unless the court has any further questions. No, I think that is not the most literal reading of the statute, Bill. Go ahead. Fair enough, Your Honor. And to the extent the court disagrees with us on the statute of limitations, the merits, we think, are clear that AP Bell controls here, so the court can decide this case on the merits. Thank you. Thank you, counsel. Thank you, Your Honors. Mr. Atkinson, we'll give you three minutes for a rebuttal. Thank you. Judge Ginsburg, Your Honor, I remembered what I was going to say. You were asking about dead discard data. In fact, they are used regularly, every stock assessment, as inputs to the stock assessment. So they are, in fact, usable, valid data points. They're used to evaluate the health of the stock. So that's where we were when it left off. So I just want to refocus here a bit. In this fishery, landings have almost no impact on the stock's overfishing status. Dead discards comprise 90% of catch and, for years, have been the driver of overfishing, including under Amendment 43. The only reason overfishing has nominally stopped since this last action in Amendment 59 is because the agency used that action to jack up the safe level of fishing. So it's not that the fishing rate has actually stopped at all. They've just raised the thresholds, and now we're under it. The stock's trajectory is overwhelmingly driven by dead discards, but the agency only constrains 10% of the catch here, the landings, in its annual catch limit mechanism. And they defend this as being consistent with the statute because they reasonably believed overfishing would not occur. So point one is it did for many years under Amendment 43. Point two is that's sort of beside the point because the whole system is the problem here. That was pre-2006 management. The belief that overfishing would not occur was the only touchstone, the only reviewable point for federal fishery management prior to 2006, and that's the NRDCV daily case. So how the system worked was the agency would cobble together a bundle of management measures for a fishery, right, things like size limits, bag limits, seasons, et cetera, that they believed that bundle would not result in overfishing. Those would go on the water. Those measures would go on the water. Years would tick by until the next stock assessment came out, and it would tell the agency were you right or were you wrong about your belief that overfishing wouldn't occur under those. Sometimes they were right. Sometimes they were wrong. If they were wrong, the only consequence was you need to try again with a new bundle of measures going forward based on the new information in the stock assessment. So assemble a new bundle that you think will not lead to overfishing going forward. Try again. So it was a do your best, and if that doesn't work, do your best again. And that's exactly what's happening here, Your Honor, with 90% of the catch. There is no limit. Where do you get the 90% and earlier the 10%? I mean, you're essentially saying there is a relationship between landings and total catch. No, Your Honor. Ninety percent of the catch is simply the amount it has happened to be in the last several years. It varies. It has increasingly grown and grown. Dead discards and landings as a proportion of total catch have shrunk over the past several decades. The 90% and 10% figures were from we cite in the briefing where they were from. They were, I think, referring to the years 2021 to 2023 or something like that. But it was a moment in time. That's what it happened to be. And you accept that percentage is roughly correct? Yes, Your Honor. How was that determined? How was that determined? By the very numbers, Your Honor, that you were questioning whether they were useful. Those numbers show the amount of dead discards in the fishery, and the landings numbers come from a different source. Okay, so those are the recollections and so on. I'm sorry, Your Honor? Those are the recollections of the recreational fishermen and so on, correct? 90%. That's right. I mean, it's from MRIP, Marine Recreational Information Program. It is a multipronged, complex survey that the agency runs nationwide with regional variation. It has many steps involved and different components. Some of them involve asking anglers about their recollection. That's right. But it produces, at the end of the day, estimates of landings and dead discards from the recreational fisheries. Did the council do that in the relevant years here? That has always been run, Your Honor. It's run by the National Marine Fisheries Service nationwide. So you say then those numbers are available. The agency could have used them. That's correct, Your Honor. And what would they show, 90% or roughly? Yes, Your Honor, they would show a very high level of fishing mortality, the vast majority of which is due to dead discards in this fishery. Okay, thank you. Okay, make sure my colleagues don't have additional questions for you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Ginsburg